# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WALTER BERNARD MORTON, JR.,

       *Plaintiff*,

     v.

UNITED STATES PAROLE
COMMISSION, *et al.*,

       *Defendants*.

Civil Action No. 17-1112 (RDM)

## MEMORANDUM OPINION

Plaintiff Walter Bernard Morton, Jr., proceeding *pro se*, is currently serving a parole-eligible sentence imposed under the D.C. Code. Describing his action as a petition for a writ of habeas corpus and challenge under 42 U.S.C. § 1983, he brings suit to contest the April 28, 2016 decision of the United States Parole Commission ("the Commission") to deny him parole until at least April 2019.[1] Dkt. 1 at 1, 27, 54. Morton alleges that when considering whether to grant him parole, the Commission unlawfully (and surreptitiously) applied guidelines first promulgated in 2000, rather than the regulations issued in 1987 and a policy guideline issued in 1991 that the parties agree should have governed the determination. *Id.* at 26.

This matter is currently before the Court on Morton's motion for summary judgment, Dkt. 13, and the Commission's cross-motion to dismiss or, in the alternative, to transfer, Dkt. 14.

---

[1] Pursuant to the National Capital Revitalization and Self-Government Improvement Act ("the Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712, 734–37 (1997), the Commission administers parole for persons convicted of D.C. Code offenses, *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 68 (D.D.C. 2008). Morton names the agency, its chairman, and two agency hearing examiners as defendants. Dkt. 1 at 1. The Court generally refers to the defendants collectively as "the Commission."

The Commission argues that Morton has brought a habeas petition and that the Court lacks jurisdiction over such a petition because Morton is currently incarcerated in Beaumont, Texas. Dkt. 14-1 at 6. It asserts, moreover, that dismissal rather than transfer is appropriate because Morton's habeas action is unlikely to succeed on the merits. *Id.* at 13. To the extent Morton's action can be characterized as seeking his release from prison through the writ, that aspect of this matter is fairly straightforward: the Court agrees with the Commission. Morton appears, however, to request a new parole hearing and that the hearing be conducted according to the procedures the parties agree govern his release. Dkt. 1 at 26–27. Whether framed as a § 1983 claim, a freestanding challenge under the Ex Post Facto Clause, or as a petition for a writ of habeas corpus, this aspect of Morton's suit presents a more complicated question. For the reasons set forth below, the Court concludes that Morton has failed to state a § 1983 or Ex Post Facto Clause claim, that the Court lacks jurisdiction over any habeas petition he seeks to bring, and that transferring the case would not be in the interest of justice. The Court will, accordingly, **GRANT** in part and **DENY** in part Defendants' motion and will **DISMISS** on its own motion the remainder of the complaint. The Court will also **DENY** Morton's motion for summary judgment because it fails to overcome the threshold issues raised by Defendants' motion to dismiss or transfer.

## I. BACKGROUND

On a motion to dismiss, the Court accepts the plaintiff's "well-pleaded factual allegations" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court also considers the attachments to the complaint, *see EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 & n.3 (D.C. Cir. 1997), and takes judicial notice of the decisions, regulations, and guidelines of the Commission, the now-defunct D.C. Parole Board, and the Federal Bureau of Prisons, *see*

*Abhe v. Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). The Court considers the remaining materials in the record insofar as they assist in determining whether it has jurisdiction. *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

On July 25, 1996, a D.C. Superior Court judge sentenced Morton to twenty-one years to life in prison for second degree murder (along with various firearm offenses related to his possession of the murder weapon). Dkt. 1 at 2–3. Under the sentencing scheme then in place, a prisoner must serve at least the lower bound of an indeterminate sentence prior to becoming eligible for parole. *See Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69 & n.3 (D.D.C. 2008). On or shortly before a prisoner reaches that parole-eligible date, the Commission holds an initial hearing. *See Bailey v. Fulwood*, 793 F.3d 127, 129 (D.C. Cir. 2015). For prisoners sentenced under the D.C. Code who committed their offenses between March 4, 1985 and August 4, 1998—as did Morton—a set of regulations promulgated by the D.C. Parole Board in 1987 govern the proceedings. *See id.* at 131; *see also* D.C. Mun. Regs. tit. 28, § 100 *et seq.* (1987) ("1987 Guidelines"). These regulations were issued pursuant to D.C. Code § 24-204, which stated:

> Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe.

D.C. Code. § 24-204(a), *superseded by* § 24-404(a) (2009); *see also Bailey*, 793 F.3d at 130. Most relevant to Morton's situation, the 1987 Guidelines "created a point system focused on offender history, offense characteristics, and behavior while in prison," with "[t]he resulting point total determin[ing] whether parole would be granted." *Bailey*, 793 F.3d at 130. "However, the [1987] Guidelines also allowed the [D.C. Parole] Board to override the point-based

determination in 'unusual circumstances.'" *Id.* (quoting D.C. Mun. Regs. tit. 28 § 204.22). In 1991, the D.C. Parole Board issued an additional "unpublished policy guideline that provided definitions of criteria, parameters, and terms used in the 1987 Guidelines." *Id.*; *see also* Policy Guideline, D.C. Board of Parole (Dec. 16, 1991) ("1991 Policy Guideline"). The Commission also refers to the 1991 Policy Guideline when evaluating parole for prisoners in Morton's position. *See Bailey*, 793 F.3d at 130–32.

After serving twenty-one years in prison, Morton became eligible for parole on January 16, 2016. Dkt. 1 at 31. He had his initial hearing several months before that date. *Id.* At the hearing, the examiner determined that Morton had "a total point score of 2 under the 1987 Board of Parole guidelines for D.C. Code offenders." *Id.* That score "indicate[d] that parole should be granted." *Id.* The examiner, however, overrode that outcome for multiple reasons. *Id.* Most notably, he found that Morton had shown "total disregard for the welfare of [the man he murdered] by not calling for medical help as soon as [Morton] shot him," instead "allowing [the victim] to suffer for at least an hour before [Morton] finally summoned medical help." *Id.* The examiner concluded that Morton's actions constituted "unusual cruelty to the victim," *id.*, an aggravating circumstance under the 1987 Guidelines, *see Sellmon*, 551 F. Supp. 2d at 71. When a hearing examiner determines that an aggravating circumstance exists, he may override the recommendation produced by the prisoner's point score. *See id.* The examiner did so in Morton's case and "recommend[ed] [that] parole be denied" and that a rehearing be set for twelve months after Morton's eligibility date. Dkt. 1 at 32.

The examiner also made other findings related to Morton's post-incarceration behavior that further influenced his decision to recommend continuing the parole hearing for a year. In concluding that it was appropriate to override Morton's point score, the examiner found that

Morton "need[ed] additional programming to remain crime-free once released to the community." *Id.* at 31. He then explained that Morton had incurred eleven disciplinary infractions while in custody, most recently in 2014, that Morton had completed only a "moderate" level of programming while in prison, and that he had not participated in classes "concerning victims of crimes." *Id.* at 32. In light of this history, the examiner concluded that Morton "need[ed] to engage in a victim impact program and . . . need[ed] a sustained period of clear conduct" before being released on parole. *Id.*

The hearing officer's recommendation was then submitted to an executive reviewer, who recommended that the Commission reject the hearing officer's conclusions. *Id.* at 36. The reviewer found that the examiner had inadequately justified the application of the unusual cruelty aggravating factor. *Id.* Specifically, he concluded that Morton's actions were not "any more cruel than needed to sustain a conviction for second degree murder."[2] *Id.* at 37. Although the reviewer recognized that post-incarceration behavior had also factored into the decision to recommend denying parole, he noted that the "primary reason" was the unusual cruelty determination. *Id.* at 37–38. The Commission, however, ultimately sided with the examiner, denied parole, and set a rehearing date for January 2017. *Id.* at 40. At the request of Morton's attorney, the Commission moved the hearing date up to August 2016, which was a year from his last hearing rather than a year from his eligibility date. *Id.* at 41–43. That date was then further advanced to April 7, 2016, to accommodate victim impact statements from the sisters of the man Morton murdered. *Id.* at 47; Dkt. 19 at 3.

---

[2] The 1991 Policy Guideline, which the parties agree applies to Morton, states that the unusual cruelty factor requires either "[p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense," or "[e]specially vulnerable victims, *e.g.*, children or elderly persons were the victims of assaultive or fraudulent behavior." Dkt. 22-1 at 34.

At that second hearing, the examiner again determined that Morton's numerical score under the 1987 Guidelines indicated that parole should be granted, but, again, declined to recommend release. *Id.* at 49. Specifically, the examiner found that Morton had committed a disciplinary infraction on December 9, 2015. *Id.* at 48. On that date, at least one sharpened piece of metal was found wedged behind a locker in Morton's cell. *Id.* Morton denied that the weapon was his and presented evidence corroborating his account, but "acknowledged . . . that someone has to be held responsible." *Id.* The examiner recommended denying parole because "the seriousness and recent occurrence of [Morton's] serious negative institutional behavior, including [his] pattern of possessing dangerous weapons, is evidence [Morton] [was] not ready to remain crime-free in the community and [his] continued incarceration . . . [was] necessary to protect the public." *Id.* at 49.

Morton's attorney raised several objections, including that the victim's family had been allowed to speak at the hearing. *Id.* at 50. In response, the examiner clarified his findings:

> I advised [Morton's attorney that] my recommendation was not even based on the testimony of the victims. Rather, it was entirely based on the fact that, in the 8 months since his last hearing, he has incurred a very serious disciplinary infraction of possessing dangerous weapons. I told him I found the subject's claim of innocence lacked credibility as this is now the third time the subject has been found guilty for possessing weapons. When you couple that with the Stalking infraction of 2014 and prior infractions for Threats, Insolence, and Refusing to Obey Orders, I found it sufficient evidence he is not ready to remain crime-free in the community. I also advised of my finding a new term of incarceration beyond the ordinary rehearing guideline was necessary to protect the public due to the recentness and severity of the weapons infraction.

*Id.* On April 28, 2016, the Commission adopted that recommendation in full, reiterating that earlier disciplinary infractions for possession of weapons in 2003 and 2004 meant that Morton's denials "lack[ed] credibility," and noting that other disciplinary infractions that had occurred prior to Morton's initial hearing supported denying parole. *Id.* at 54.

Later that year, the corrections officer who originally reported Morton for possession of the weapon in 2015 formally requested that the disciplinary incident be expunged from Morton's record. *Id.* at 63. The officer stated that Morton "was wrongfully charged with the possession of a dangerous weapon" because further searches behind lockers elsewhere in the prison had uncovered vast quantities of similar weapons in identical locations, suggesting that the weapons had accumulated over time. *Id.* Morton's lawyer requested that the Commission reopen his hearing on the basis of this new information. Dkt. 14-2 at 3. The Commission then contacted the prison where Morton was being held, which relayed that the Disciplinary Hearing Officer who found Morton guilty "ha[d] no intention of expunging the incident report based upon the [staff member's] recommendation." Dkt. 14-5 at 3. Instead, the only way to have the disciplinary infraction expunged was through an administrative appeals process. *Id.* Morton had in fact already attempted to utilize that procedure, but his appeal was denied prior to the investigator's request that the Bureau of Prisons expunge the disciplinary incident. *Id.* After the investigator's recommendation, Morton once more sought administrative expungement. *Id.* That request was, again, denied. *Id.*

Because the Commission's policy is that an adverse finding under prison disciplinary procedures "is considered conclusive evidence of guilt," the result of Morton's administrative appeals led the Parole Commission hearing examiner to recommend against reopening Morton's parole hearing. *Id.* The examiner further noted that he was "not swayed by" the corrections officer's request for expungement, concluding "that the subject's history of possessing weapons makes him a risk to the community." *Id.* The Commission concurred in that recommendation on December 16, 2016. *Id.* at 4. Shortly thereafter, Morton commenced this action. Dkt. 1 at 27. His next parole rehearing is scheduled for April 2019. *Id.* at 54.

## II. ANALYSIS

The Court begins by clarifying exactly what kind of lawsuit Morton filed. The handwritten initial pleading asserts that Morton is both a "Petitioner for Writ of Habeas Corpus" and a "Plaintiff" seeking relief under "42 U.S.C. [§] 1983." Dkt. 1 at 1. He asks the Court to "grant him a rehearing," concedes that the sovereign immunity of the Commission bars any money damages, and requests that the Court "grant his [p]etition[] [for a writ] of [h]abeas [corpus for] a[n] Ex[ ]Post[ ]Facto violation." *Id.* at 26–27. Morton's opposition to Defendants' motion to dismiss does little to clarify the issue, stating that he "did indeed file a petition for writ of habeas corpus," Dkt. 19 at 6, and focusing on the Commission's alleged violation of the Ex Post Facto Clause, *id.* at 9–13. But he also cites to *Sellmon v. Reilly*, a case in which inmates incarcerated outside of the District of Columbia brought § 1983 claims against the Commission on theories of liability similar to those Morton asserts. Dkt. 19 at 13. He argues that that case and *Wilkinson v. Dotson*, 544 U.S. 74 (2005), show that prisoners may challenge certain parole decisions outside of their districts of incarceration through means other than habeas. Dkt. 19 at 13.

Although far from clear, construing Morton's pleadings liberally, he asserts three separate causes of action: (1) a petition for a writ of habeas corpus; (2) a claim under § 1983; and (3) a freestanding constitutional claim alleging that the application of later-passed parole guidelines to his most recent hearing violated the Constitution's prohibition on ex post facto laws. The Court considers each in turn, returning to his habeas petition in the context of evaluating whether it would be in the interest of justice to transfer the case after considering the merits of the latter two causes of action.

## A.    Habeas Corpus

The Commission argues that "Petitioner's claims sound in habeas because [he] is demanding 'immediate relief from custody, or seeks to advance his release date,'" Dkt. 14-1 at 10–11 (quoting *Thomas v. Fulwood*, 128 F. Supp. 3d 341, 345–46 (D.D.C. 2015)), and, on that basis, it asserts that the Court lacks jurisdiction because Morton is not incarcerated within the District of Columbia, Dkt. 14-1 at 10–12.  To the extent that Morton seeks such relief, the Court agrees that it lacks jurisdiction and that it must dismiss or transfer the case.  *See Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 663–66 (D.C. Cir. 2013).

The premise that Morton seeks only to advance—or even principally to advance—his release date, however, is incorrect.  To the contrary, although the precise scope of the relief Morton seeks is far from clear, it is evident that, first and foremost, he seeks to move up the date of his next parole hearing and for the Court to order that the Commission comply with the 1987 Guidelines and 1991 Policy Guideline—actions that, taken together, will merely give him another *opportunity* to secure release.  Dkt. 1 at 26–27.  As Morton correctly notes in his reply, a claim that "seek[s] relief that will render invalid the state procedures used to deny . . . parole suitability . . . would [not] necessarily spell speedier release," and thus need not be brought as a habeas petition in the jurisdiction where the petitioner is being held.  *Wilkinson*, 544 U.S. at 82; *accord Bailey*, 793 F.3d at 135–36 (evaluating the merits of ex post facto claim brought by prisoner incarcerated outside of the District of Columbia and distinguishing such an action from a petition for a writ of habeas corpus).  Morton, accordingly, need not challenge the actions of the Commission through a petition for a writ of habeas corpus.  Of course, whether he must bring his suit as a petition for a writ of habeas corpus is a different question than whether he may.  After first considering the other potential avenues for relief available to Morton, the Court returns to this issue.

**B.    42 U.S.C. § 1983**

The Commission acknowledges that "[t]he first page of [Morton's] Petition also references 42 U.S.C. § 1983," but argues that Morton "does not plead facts or assert any claim under Section 1983." Dkt. 14-1 at 11. It continues that, even "[i]f the Petition can be construed as asserting claims under Section 1983 against [the Commission], its chairman, and two of its hearing examiners"—that is, those individuals also named as defendants—"these claims are barred by the doctrine of sovereign immunity." *Id.* Sovereign immunity, however, only bars Morton's claim to the extent that he sues the Commission itself or seeks monetary relief against any of the defendants. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) ("[A] cause of action under § 1983 will lie against the individual members of the Commission when acting pursuant to the Revitalization Act."); *cf. Morgan v. U.S. Parole Comm'n*, 304 F. Supp. 3d 240, 247–50 (D.D.C. 2016) (holding that sovereign immunity bars claims for money damages against the Commission and against its officials when sued in their official capacities, but does not bar claims for injunctive relief or claims for money damages against individual defendants sued in their personal capacities). To the extent he seeks injunctive relief against the individual defendants or sues federal officials for money damages in their personal capacities, in contrast, sovereign immunity is no bar to his claim.

In support of its categorical assertion of sovereign immunity, the Commission relies on two opinions of this Court: *Head v. Fed. Bureau of Prisons*, 86 F. Supp. 3d 1, 4–5 (D.D.C. 2015), and *Thomas v. Fulwood*, 128 F. Supp. 3d 341, 345–46 (D.D.C. 2015). Neither persuades the Court that the Commission's position is correct.

*Head* involved a challenge to the calculation of good time credits brought by a prisoner sentenced under the D.C. Code. 86 F. Supp. 3d at 3. That prisoner sued the Commission and the Bureau of Prisons. *Id.* The Court held that the prisoner had conceded that sovereign immunity

barred his § 1983 challenges to the agencies' actions. *Id.* at 4. It nonetheless observed that the Commission "is a federal government entity; neither the [Commission] nor any one of its Commissioners is subject to a suit for damages under 42 U.S.C. § 1983 for an action taken with respect to a District of Columbia Code offender." *Id.* at 5. For this proposition, the Court relied on *Settles v. United States Parole Commission*, 429 F.3d at 1104. But the holding in *Settles* sweeps less expansively than the Court in *Head*—and now the Commission—suggest. The D.C. Circuit expressly stated in *Settles* "that a cause of action under § 1983 will lie against the individual members of the Commission when acting pursuant to the Revitalization Act § 11231," which is the section of that law giving the Commission authority to administer parole for persons sentenced under the D.C. Code. *Id.* at 1104. *Settles* did hold that "the Commission itself" was not "subject to liability under § 1983," *id.* at 1105, but Morton has sued officers of the Commission as well as the agency, Dkt. 1 at 1, unlike the plaintiffs in *Settles*, 429 F.3d at 1106, and *Head*, 86 F. Supp. 3d at 3.

The second case cited by the Commission is inapposite because it involved a prisoner sentenced under federal law. *Thomas*, 128 F. Supp. 3d at 344. That means that, unlike in the present case, the parole commissioner named as a defendant in *Thomas* was acting under color of federal law, depriving the plaintiff in that case of a cause of action under § 1983. *See Settles*, 429 F.3d at 1104. In *Thomas*, moreover, the Court correctly held that sovereign immunity barred *any* claim for money damages against the Commission and its officers to the extent they had been sued in their official capacities, regardless of whether the Commission and its officers were acting under color of state or federal law. 128 F. Supp. 3d at 346–47. That reasoning does not extend to the present action, however, to the extent that Morton's pleading might be construed to assert personal-capacity claims against individual officials, and, more clearly, to the extent it

seeks non-monetary relief.  *See Hill v. U.S. Parole Comm'n*, No. 16-1476, 2017 WL 2414446, at

*6 (D.D.C. June 2, 2017).[3]

The Court, accordingly, concludes that sovereign immunity does not bar Morton's claim

for injunctive relief against the Commission's chairman and its hearing examiners.  That does

not end the matter, however, because the Court retains the power to dismiss on its own motion

any action brought by a plaintiff proceeding *in forma pauperis* that fails to state a claim on which

relief may be granted.  28 U.S.C. § 1915(e)(2)(B)(ii).  Because the deprivation of rights alleged

under Morton's § 1983 claim is the same purported constitutional violation giving rise to his

action for injunctive relief under the Ex Post Facto Clause of the Constitution, the Court

considers those claims together below.

## C.    Ex Post Facto Clause

The central allegation underlying Morton's complaint is that during his most recent

hearing,[4] the Commission applied parole guidelines promulgated in 2000 rather than the 1987

Guidelines and 1991 Policy Guideline.  "The Supreme Court has held that a retroactively applied

parole regulation, guideline, or policy statement may violate the Ex Post Facto Clause if it

creates 'a significant risk' of 'a longer period of incarceration than under the earlier rule.'"

*Sellmon*, 551 F. Supp. 2d at 84 (emphasis omitted) (quoting *Garner v. Jones*, 529 U.S. 244, 255

---

[3]  Because Morton seeks non-monetary relief, the Court need not determine whether Morton has
in fact alleged claims against Commission officials in their individual capacities.

[4]  Given the relief that Morton seeks, any claims related to his 2015 hearing would be rendered
moot by the provision, in 2016, of an additional parole hearing conducted under the proper
guidelines.  *See Hill*, 2017 WL 2414446 at *8; *Hunter v. Reilly*, 693 F. Supp. 2d 53, 58 (D.D.C.
2010), *aff'd*, 405 F. App'x 514 (D.C. Cir. 2011).  Because the Court concludes that the 2016
decision to deny Morton parole complied with the Constitution's prohibition on ex post facto
laws, the Court only discusses Morton's arguments relating to his most recent hearing and
subsequent request to reopen the proceedings.

(2000)). After this Court's decision in *Sellmon*, holding that the Commission's application "of the 2000 [G]uidelines to inmates convicted of crimes prior to the promulgation of the 2000 [G]uidelines violated the Ex Post Facto Clause," the Commission began requiring the use of the 1987 Guidelines for hearings involving prisoners sentenced under the D.C. Code for crimes committed between 1985 and 1998, such as Morton. Dkt. 14-1 at 13–14.

Consistent with this change in course, the Commission argues that the hearing examiner and Commission applied the 1987 Guidelines, supplemented by the 1991 Policy Guideline, at Morton's 2016 parole hearing. *Id.* at 14. In particular, the Commission observes that the Notice of Action from Morton's April 7, 2016 hearing begins by stating that the 1987 Guidelines were being applied, before proceeding to evaluate his suitability for parole under the framework established by those regulations. *Id.* (citing Dkt. 1 at 54–55). The Court concurs in this reading of the undisputed record. The examiner put on the record that he was applying the 1987 Guidelines before proceeding to use the scoring framework set forth in those guidelines to determine whether parole should be granted.

As the Commission notes, Morton "seems to be arguing instead that [the Commission's] decision[] to deny him parole [is] not supported by the 1987 [G]uidelines' standards governing parole decisions." *Id.* at 14; *see also* Dkt. 1 at 22 (arguing that the Commission's decision was "arbitrary and capricious," "totally lacking in evidentiary support," and "so irrational as to be fundamentally unfair" (internal quotation marks omitted)); Dkt. 19 at 4–5, 10–13 (arguing that the disciplinary infractions relied upon by the examiner in 2016 were too old to be considered under the 1991 Policy Guideline). Understood in this light, Morton's claim is squarely foreclosed by the D.C. Circuit's decision in *Bailey v. Fulwood*. The plaintiff in *Bailey* also alleged that the Commission had surreptitiously or improperly relied on factors that could be

considered under the 2000 Guidelines, despite the Commission stating that it was denying parole under the 1987 Guidelines and 1991 Policy Guideline. 793 F.3d at 131. The D.C. Circuit rejected the argument that it would violate the Ex Post Facto Clause to "simply . . . cit[e] the correct rules, while in fact following" a later enacted regulation. *Id.* at 135. As the Court of Appeals explained, "the Ex Post Facto Clause asks whether the [Commission] applied the *correct* parole guidelines and not whether the [Commission] *correctly* applied the parole guidelines." *Id.* (internal quotation marks omitted). Here, the Notice of Action and hearing examiner's findings make clear that the Commission applied the proper guidelines, leaving the bulk of Morton's claim on the wrong side of the *Bailey* dichotomy. *See Ford v. Massarone*, 208 F. Supp. 3d 91, 105 (D.D.C. 2016) (collecting cases holding that Notices of Actions that facially apply the 1987 Guidelines suffice to preclude a claim under the Ex Post Facto Clause).

Despite premising his claims on the Ex Post Facto Clause, Morton makes only a single allegation that the Commission applied the incorrect guidelines, as opposed to incorrectly applying the proper guidelines. He argues that the length of the "set-off" applied at his most recent hearing to determine when his next hearing would occur was thirty-six months. Dkt. 1 at 26. Morton asserts that the application of the 1987 Guidelines would have led to a set-off of twelve months and thus the length of the set-off in his case shows that the Commission has applied the 2000 Guidelines. *Id.* The Court is unconvinced. A review of the Commission's decision shows that the guidelines and statutes allowing for the longer set-off were in effect prior to both Morton's offense conduct and sentencing.

After the hearing in question, the examiner stated that "a new term of incarceration beyond the ordinary rehearing guideline"—referring to the standard twelve-month set-off—"was necessary to protect the public due to the recentness and severity of [Morton's] weapons

infraction." *Id.* at 50; *see also id.* at 54 (Notice of Action stating that, although "[t]he guidelines for the time to rehearing indicate that [Morton's] next hearing should be scheduled within twelve months," the Commission found that "[a] departure from these guidelines is . . . warranted for the same reasons" that parole was denied). Under the guidelines Morton contends should have been applied,[5] set-offs beyond twelve months can clearly be ordered. *See Shakir v. Fulwood*, 108 F. Supp. 3d 1, 4 (D.D.C. 2015) (holding that twelve-month set-offs are "not mandatory"); *see also Jones v. Braxton*, 647 A.2d 1116, 1117 (D.C. 1994) (holding that 28 DCMR § 104.11 "expressly authorizes the [Commission] to disregard the suggested timeframes" for set-offs). Morton argues, however, that the Commission nevertheless erred when it applied those guidelines. He notes that the guidelines provide, in part, that when "one or more aggravating factors [is] present," the Commission may "schedule a reconsideration date later than the prescribed set-off." Dkt. 23 at 13. Those aggravating factors "include but are not limited to" the presence of "repeated or extremely serious negative institutional behavior" and the determination that "[t]he offender poses a serious threat to . . . others and adequate resources are not available in the community." *Id.* at 13–14. Here, the Commission based the extended set-off in large part on the 2015 weapons infraction, which it characterized as "serious negative institutional behavior" demonstrating that Morton was "not ready to remain crime-free in the community." Dkt. 13 at 41; Dkt. 14-5 at 2; Dkt. 1 at 54. As Morton notes, however, the 1991 Policy Guideline defines the factor "repeated or extremely serious negative institutional behavior" in a way that (as the

---

[5] The guidelines addressing rehearing set-offs were adopted in 1992, Dkt. 22-1 at 57, and 1988, 28 DCMR §§ 104.1–11, and are distinct from the 1987, 1991, and 2000 guidelines at issue in much of this case. Because Morton's underlying offense conduct occurred in 1995, Dkt. 1 at 31, and he was sentenced in 1996, Dkt. 1 at 2, this distinction is of no moment; the *application* in 2016 of guidelines *adopted* in 1992 or 1988 to someone *sentenced* in 1996 for crimes *committed* in 1995 poses no ex post facto problem.

Court explains further below) likely precluded the Commission from concluding that Morton's institutional record constituted such behavior. Dkt. 22-1 at 35. But whether or not the Commission *could* have properly found an aggravating factor under this particular provision—given that the list is explicitly nonexclusive, Dkt. 23 at 13—the Commission retains substantial discretion under both the governing statute, D.C. Code. § 24-204(a), *superseded by* § 24-404(a) (2009); *see also Bailey*, 793 F.3d at 134, and the relevant guidelines, Dkt. 22-1 at 8; 28 DCMR § 104.11 ("Notwithstanding any other provision of this section, the Board may order a parole reconsideration date it determines to be appropriate."), to depart from the standard set-off for reasons unrelated to these aggravating factors.

Although the Commission's conclusions are not a model of clarity, the Court concludes that the Commission did in fact invoke the discretion allowed by the statute and governing guidelines in effect at the time Morton committed the offense for which he remains incarcerated, rather than determining that Morton's institutional record constituted "repeated or extremely serious negative institutional behavior" under the 1991 Policy Guideline. Notably, the Commission concluded that "[a] departure from the[] guidelines" with respect to the length of his set-off was "warranted" because "the seriousness and recent occurrence of [his] serious negative institutional behavior . . . [constituted] evidence [that Morton] was not ready to remain crime-free in the community and [that his] continued incarceration" for at least thirty-six more months was "necessary to protect the public." Dkt. 1 at 54. This finding comports with the guideline for determining non-standard set-offs, 28 DCMR § 104.11, and mirrors the language in the relevant D.C. Code provision, which provides that the Commission may grant parole only upon a finding "that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law" and "that his release is not incompatible with the welfare of society," D.C.

Code § 24-204(a), *superseded by* § 24-404(a) (2009). The Commission's conclusion, resting as it does on the text of the governing statute and the discretion afforded by the guidelines, was sufficient to justify a departure from the standard set-off period. *See generally Hall v. Henderson*, 672 A.2d 1047 (D.C. 1996) (describing findings necessary to prescribe non-standard set-offs). Thus, in both form and substance, the Commission followed the regulations applicable to Morton, rather than utilizing the 2000 Guidelines as he alleges.

**D.**    **Request to Transfer the Action**

Having considered and rejected Morton's constitutional and § 1983 claims, the Court returns to the question whether habeas relief may be *available* to Morton, even if not *required* given the relief he seeks. In *Bailey*, the D.C. Circuit noted that prisoners wishing to challenge the reasoning behind a decision of the Commission might file a petition for a writ of habeas corpus in the jurisdiction of their incarceration. 793 F.3d at 135. Moreover, although the D.C. Circuit has not reached the issue, several circuits have held that a prisoner may bring a petition for a writ of habeas corpus alleging that the Commission's denial of parole lacks a "rational basis." *See Curtis v. Chester*, 626 F.3d 540, 544 (10th Cir. 2010) (holding that on a petition for a writ of habeas corpus challenging a decision of the Commission, "the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons" (internal quotation marks omitted)); *Langella v. Anderson*, 612 F.3d 938, 940 (8th Cir. 2010) ("We have jurisdiction to review a prisoner's claim only insofar as it properly alleges that the Parole Commission exceeded the scope of its discretion, violated the Constitution, or reached decisions so arbitrary and capricious as to amount to a violation of due process." (internal quotation marks omitted)); *Furnari v. U.S. Parole Comm'n*, 531 F.3d 241, 247–48 (3d Cir. 2008) ("We review the administrative findings of fact to determine whether there is a rational basis in the record for the [Parole Commission's] conclusions embodied in its statement

of reasons." (internal quotation marks omitted)); *Thompson v. Veach*, 501 F.3d 832, 837 (7th Cir. 2007) (evaluating whether thirty-six month set-off given to a D.C. Code offender "constitute[d] exceptionally arbitrary conduct"). *But see Nettles v. Grounds*, 830 F.3d 922, 933–35 (9th Cir. 2016) (holding that "habeas is available only for actions in the 'core of habeas'" and challenges by state prisoners that do not contest "the fact or duration of the conviction or sentence" must be brought under § 1983).

Assuming for the sake of argument that a habeas petition in the district of Morton's incarceration would provide a vehicle for reviewing the substance of the Commission's decision denying him parole, the Court nevertheless concludes that transferring this action is not in the interest of justice. The Court, accordingly, will instead dismiss the case. *See Zaidi v. U.S. Sentencing Comm'n*, 144 F. Supp. 3d 1, 3 (D.D.C. 2015) (declining to transfer habeas petition because, "given the nature" of the petitioner's claims, success was unlikely), *aff'd*, 672 F. App'x 7 (D.C. Cir. 2016); *Boultinghouse v. Lappin*, 816 F. Supp. 2d 107, 114 (D.D.C. 2011) (dismissing rather than transferring habeas petition because it was "unlikely that a transferred claim would be successful"); *see also Gadson v. Bureau of Prisons*, 22 F.3d 1184 (D.C. Cir. 1994) (table decision) ("[B]ecause appellant's claim is without legal basis, it is not in the interest of justice to transfer the [habeas] petition to the appropriate court.").

Liberally construed, Morton's filings raise three principal challenges to the reasoning behind the Commission's most recent decision[6] to deny him parole. First, Morton argues that the

---

[6] The "decision" as relevant here proceeded in several steps. First, on April 7, 2016, a hearing examiner conducted an in-person parole hearing and produced a recommendation that parole be denied. Dkt. 1 at 47–50 (Hearing Examiner Report and Recommendation). Then, a sufficient number of Parole Commissioners approved the recommendation in late April. *Id.* at 51–52. The Commissioners' approval resulted in the April 28, 2016 Notice of Action, which adopted the reasoning of the examiner's report. *Id.* at 54–55. Finally, Morton sought to reopen his hearing

Commission improperly relied on his 2015 weapons infraction. He identifies two purported defects in the consideration of this asserted infraction. As an initial matter, he states that because the disciplinary infraction had by then been called into question, Dkt. 1 at 63, it was arbitrary and capricious for the Commission to rely on the incident in December 2016, when it denied his request to reopen his case in advance of his April 2019 rehearing date, Dkt. 14-5 at 3. The Court disagrees. As the hearing examiner noted, the Bureau of Prisons ultimately decided not to follow the recommendation for expungement cited by Morton. *Id.* According to the Commission's policies, that finding by the Bureau of Prisons was "considered conclusive evidence of guilt" in the eyes of the Commission. *Id.* Because of the additional facts and expertise available to the Bureau of Prisons when considering disciplinary incidents occurring in federal facilities, the Commission's deference was not irrational. After reviewing the investigator's report recommending expungement, moreover, the Commission independently concluded that the report provided insufficient grounds to reverse its earlier conclusion that Morton's record of weapons possession "makes him a risk to the community" sufficient to deny parole for an additional thirty-six months. *Id.* That conclusion, even if it the Court *might* reach a different one reviewing the evidence de novo, was rational.

Morton also challenges the Commission's reliance on the 2015 weapons infraction on the ground that, if it occurred, it was insufficiently serious to deviate from the presumption of release resulting from his "total point score of 2 under the 1987 Board guidelines for D.C. Code offenders." Dkt. 1 at 49. The Court is unconvinced that the decision to deviate from the numerical guidelines was irrational. Under the 1987 Guidelines, the Commission has the

_____

after he received notice that the Bureau of Prisons investigator had recommended the 2015 weapons infraction be expunged from his record. Dkt. 14-2 at 2–3. The Commission denied that request on December 16, 2016. Dkt. 14-5 at 2–4.

discretion to depart from the presumption of release resulting from a prisoner's numerical score, so long as it "specif[ies] in writing those factors which it used to depart from the strict application of the provisions of this chapter." Dkt. 22-1 at 8; *see also Bailey*, 793 F.3d at 132. The guidelines do not limit the Commission's authority to depart from the presumption of release based on the "seriousness" of the infraction. And, more importantly, given the Commission and Bureau of Prisons' view of the seriousness of the weapons infraction, reliance on the incident to deviate from the score in this case was not irrational.

Morton responds that, under the 1991 Policy Guideline, to overcome a numerical score recommending parole on the basis of "negative institutional behavior," the Commission must conclude that such behavior was "repeated or extremely serious."[7] Dkt. 22-1 at 35. In the context of a parole reconsideration hearing, the 1991 Policy Guideline defines "repeated or extremely serious negative institutional behavior" as the commission of "*[t]wo or more*" offenses similar in severity to Morton's weapons possession infraction "*since the preceding release consideration on the sentence.*" Dkt. 22-1 at 35 (emphasis added). As Morton correctly observes, the only disciplinary offense relied on by the Commission that occurred between his 2015 and 2016 hearings was the 2015 weapons possession infraction. Dkt. 1 at 49, 54. His argument nevertheless fails.

As noted above, the 1987 Guidelines clearly specify that the Commission retains the discretion to deviate from the recommendation produced by a prisoner's numerical score so long as the Commission specifies its reasons, whatever they may be, in writing. The 1991 Policy

---

[7] Whether a prisoner has "committed serious disciplinary infractions" is also relevant to the calculation of the numerical score that creates a presumption of parole or continued confinement. Dkt. 22-1 at 11. At issue here, however, is the Commission's practice of designating certain disciplinary infractions as "factors countervailing" a presumption of parole that has been generated by the numerical score. *Id.* at 33.

Guideline expounds upon certain terms in the 1987 Guidelines, but does not supersede them. *See Bailey*, 793 F.3d at 130 ("In 1991, in an effort to facilitate consistency in Guideline application, the Board also issued an unpublished policy guideline that provided definitions of criteria, parameters, and terms used in the 1987 Guidelines." (internal quotation marks omitted)). The 1987 Guidelines and 1991 Policy Guideline, moreover, "never constrained the discretion of the" D.C. Parole Board or the Commission. *Id.* at 132. The only authority binding on parole hearings for persons in Morton's position is the governing statute, which simply provides that to depart from the numerical scoring system the Commission must "specif[y] in writing those factors which it used." *Id.* (quoting *McCrae v. Hyman*, 667 A.2d 1356, 1360 (D.C. 1995)). The Commission, accordingly, "need not render a decision based on a strict application of the system set forth in the 1987 Regulations."[8] *Id.*

In the Notice of Action at issue here, the Commission specified the bases for its decisions to deny parole. Dkt. 1 at 54 ("The Commission finds the seriousness and recent occurrence of your serious negative institutional behavior, including your pattern of possessing dangerous weapons, is evidence you are not ready to remain crime-free in the community and your continued incarceration[] beyond the ordinary rehearing guideline is necessary to protect the public."). These justifications are sufficient to comply with both the 1987 Guidelines and the

---

[8]  The nonbinding nature of the 1987 Guidelines and 1991 Policy Guideline occasionally leads to incongruous results in cases such as this one. In light of the Supreme Court's decision in *Garner v. Jones*, 529 U.S. 244 (2000), the retroactive application of even "policy statements from which the Commission may depart in its discretion" can violate the Ex Post Facto Clause, *Bailey*, 793 F.3d at 134 (quoting *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004)). That means that, if "retroactive application" of the 2000 Guidelines were to "create[] a significant risk of prolonging [a prisoner's incarceration] as compared to application of the" 1987 Guidelines and 1991 Policy Guideline, applying the 2000 Guidelines instead of the earlier guidelines would be unconstitutional—despite the earlier guidelines themselves never cabining the discretion of the Commission under the organic statute. *Daniel v. Fulwood*, 766 F.3d 57, 61 (D.C. Cir. 2014).

governing statute, and are not themselves irrational.[9]  *See Bailey*, 793 F.3d at 132–34; *Ford*, 208 F. Supp. 3d at 107–08.

Morton's two remaining arguments fail for similar reasons.  The first of these concerns the Commission's decision in 2016 to utilize a thirty-six month set-off rather than the typical twelve month set-off.  Dkt. 1 at 54.  As discussed in the course of the Court's analysis of Morton's ex post facto claim, the Commission both applied the proper guidelines and statutory provisions and made the finding called for by that framework to justify an extended set-off.  Morton's recent weapons infraction supplied a rational basis for the decision.  Morton's final challenge to the Commission's 2016 decision to deny him parole rests on its references to disciplinary infractions that occurred in 2003, 2004, and 2014.  Dkt. 1 at 49, 54.  Those disciplinary infractions occurred prior to his 2015 hearing, and under the 1991 Policy Guideline, it appears they should not have been considered when determining whether he had exhibited negative institutional behavior sufficient to overcome the recommendation produced by his numerical score.  But, as noted above, under the 1987 Guidelines and controlling D.C. Circuit precedent, the Commission has retained substantial discretion to override a prisoner's numerical score even after its adoption of the 1991 Policy Guideline.  It must, of course, explain its reason for doing so, and that explanation must pass the rational basis test, but the Commission did so here.

---

[9]  Even if Morton's challenges to the 2015 parole hearing were not moot, similar reasoning would preclude any claim with respect to that decision.  *See* Dkt. 1 at 40 ("[A] departure from the guidelines at this consideration is found warranted because the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety."); *id.* (describing a perceived need for further programming and finding unusual cruelty was shown to the victim).

That leaves only the question of whether the Commission's finding that Morton's negative institutional record created "a reasonable probability that [he] would not obey the law if released and [his] release would endanger the public safety," Dkt. 1 at 54, was itself rational. Given the content of Morton's institutional record, the Court cannot conclude that the Commission's determination was irrational.

Having thus identified some of the difficulties Morton's claim would face if it were to be construed as a petition for a writ of habeas corpus, the Court returns to the procedural posture of the present case. To the extent such a petition would provide Morton a cause of action to seek review of the Commission's decision, the Court lacks jurisdiction over his claim because Morton is incarcerated outside of this district. *See Chatman-Bey v. Thornburgh*, 864 F.2d 804, 811 (D.C. Cir. 1988). Under 28 U.S.C. § 1631, "when a court concludes that it lacks jurisdiction, it has the authority to dismiss the action or transfer it in the interest of justice." *Smith v. U.S. Bureau of Prisons*, 971 F. Supp. 2d 99, 102 (D.D.C. 2013). In light of the Court's limited review of the potential merits of Morton's claim, however, the Court concludes that it would not be in the interest of justice to transfer the case. The Court, accordingly, will dismiss Morton's action.

**CONCLUSION**

For these reasons, the Court will **DENY** Morton's motion for summary judgment, Dkt.

13, will **GRANT** in part and **DENY** in part Defendants' motion to dismiss or, in the alternative,

to transfer, Dkt. 14, and will **DISMISS** the remainder of the complaint on its own motion.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  July 6, 2018